# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Giovanni Veliz,

Plaintiff,

Civ. No. 07-2376 (RHK/JJK)
**MEMORANDUM OPINION AND ORDER**

v.

City of Minneapolis and the Minneapolis
Police Department,

Defendants.

---

John A. Klassen, John A. Klassen, P.A., Minneapolis, Minnesota, for Plaintiff.

Gregory P. Sautter, C. Lynne Fundingsland, Minneapolis City Attorney's Office,
Minneapolis, Minnesota, for Defendants.

---

Plaintiff Giovanni Veliz is a sergeant working for the Minneapolis Police

Department ("MPD").  After failing to obtain a transfer to the Minnesota Gang Strike

Force, he commenced the instant action, alleging that the transfer was denied for

discriminatory and retaliatory reasons.  Defendants[1] now move for summary judgment on

each of Veliz's claims.  For the reasons set forth below, the Court will deny the Motion.

---

[1] Veliz has named both the MPD and the City of Minneapolis (the "City") as defendants
in this action.  The MPD, however, is a department of the City and not a separate legal entity
subject to suit.  See, e.g., Edwards v. City of St. Anthony, Civ. No. 07-2559, 2008 WL 341714,
at *1 n.4 (D. Minn. Feb. 7, 2008) (Rosenbaum, C.J.) (citing Hyatt v. Anoka Police Dep't, 700
N.W.2d 502, 506 (Minn. Ct. App. 2005)); Stepnes v. Tennessen, Civ. No. 04-68, 2006 WL
2375645, at *12 (D. Minn. Aug. 16, 2006) (Ericksen, J.).  Accordingly, the MPD will be
dismissed as a defendant.

**BACKGROUND**

Veliz was born in Ecuador and moved to the United States in 1979.  (Veliz Dep.

Tr. at 5-6.)  He began working for the MPD in its cadet training program in June 1992.

(Id. at 18-19.)  Upon completing that program, he became a patrol officer in the City's

third precinct.  (Id. at 19.)[2]  He worked as a patrol officer in the third and fourth precincts

from 1993 to 1996; he also spent part of 1995 working with a "multi-agency organized

crime law enforcement unit . . . work[ing] with the federal Drug Enforcement Agency

('DEA') in anti-gang narcotics investigations."  (Veliz Aff. ¶ 4.)

In January 1996, Veliz was transferred into the MPD's organized-crime unit.

(Veliz Dep. Tr. at 21; Klassen Aff. Ex. 1.)  There, he worked with a Federal Bureau of

Investigation ("FBI") task force investigating drug- and gang-related organized crime.

This work involved surveillance, including obtaining federal wiretaps, and investigation

and arrests of violent gang members involved in drug trafficking.  (Veliz Aff. ¶ 5.)

In August 1996, Veliz was transferred back to the fourth precinct.  (Veliz Dep. Tr.

at 21-22.)  He worked there as a patrol officer until September 1997, when he volunteered

to work in the third precinct SAFE unit.  (Id. at 22-23.)  The SAFE unit primarily

performed crime-prevention duties, but it also included a patrol component.  (Lubinski

Dep. Tr. I at 23-25.)  There, Veliz performed anti-gang, anti-drug, and anti-prostitution

work, including conducting investigations (both in uniform and undercover) and

---

[2] The City is divided into five patrol zones or precincts.  (Smith Dep. Tr. at 29.)

executing warrants.  (Veliz Aff. ¶ 6.)  His work also involved building relationships with the City's Hispanic community.  (Id. ¶ 7.)  While working in the SAFE unit, Veliz was promoted to sergeant, the first supervisory rank in the MPD.  (Veliz Dep. Tr. at 23; Klassen Aff. Ex. 1; Lubinski Dep. Tr. I at 10-11.)  He was then transferred to the second precinct's SAFE unit.  (Veliz Dep. Tr. at 23.)

Approximately one year after his promotion to sergeant, Veliz transferred to the fifth precinct's Community Response Team ("CRT") at the request of that precinct's commander.  (Id. at 23-24; Klassen Aff. Ex. 1.)  According to Timothy Dolan, the current Chief of Police for the MPD, CRTs are "elite" volunteer units staffed by "people that are motivated, hard workers."  (Dolan Dep. Tr. at 80.)  Among other things, CRTs are designed to tackle precinct-level problems, including narcotics, prostitution, and forgery.  (Id.; Lubinski Dep. Tr. at 26-27.)

The fifth precinct CRT comprised two shifts.  The morning shift performed narcotics investigations and surveillance and executed warrants.  The night shift performed "directed patrols," which involved going into areas that had seen recent increases in "livability issues" (misdemeanor crimes) and "saturating" them with extra police officers in an attempt to remedy the problems.  (Veliz Dep. Tr. at 24-26, 42-43.)  When Veliz first transferred to the CRT, he supervised the day shift.  (Id. at 43-44.)  Approximately five months later, the CRT's commanding officer, then-Lieutenant Mark Ellenberg, asked him to supervise the night shift.  (Id. at 25, 44.)  He remained the night-shift supervisor for the remainder of his four years with the CRT.  (Id. at 26-27.)

However, due to his Spanish-speaking skills, his narcotics and gang experience, his previous work in undercover investigations, and his community outreach efforts with the Hispanic community, he was frequently asked by Ellenberg to supervise narcotics operations during the morning shift in addition to his work on the night shift.  (Id. at 25-27; Ellenberg Aff. ¶¶ 7, 10.)  As a result, Veliz regularly participated in, and supervised other officers participating in, serving narcotics-related search warrants, narcotics investigations and surveillance, and anti-gang policing.  (Id. ¶¶ 5-7; Klassen Aff. Exs. 6-7; see also Lubinski Dep. Tr. I at 65-67.)  In addition, he was asked by MPD administration to continue building relationships with the City's Hispanic community while working on the CRT.  (Veliz Dep. Tr. at 44.)

In January 2004, Robert Olson, then-Chief of Police for the MPD, asked Veliz if he would be willing to work as Olson's personal assistant and as the personal assistant for the incoming Police Chief, William McManus.  (Id. at 27-29; Veliz Aff. ¶ 9.)  Veliz accepted the position, which entailed primarily administrative functions.  (Veliz Dep. Tr. at 29-30.)  In his new position, Veliz also was "tasked with communicating on behalf of the police department with the Hispanic community in Minneapolis."  (Veliz Aff. ¶ 11.)  As a result of that work, he was "repeatedly made aware of complaints by the Hispanic community that the police department was engaging in what they believed to be civil rights violations," as well as complaints concerning language barriers between the police and members of the Hispanic community.  (Id.)  Veliz brought these complaints to the attention of senior MPD officials, believing that the MPD might have been in violation of

4

a Memorandum of Agreement it had signed in 2003.  (Id. ¶ 12; Veliz Dep. Tr. at 48, 61-62; Klassen Aff. Ex. 12.)[3]

In February 2005, then-Deputy Chief of Police Sharon Lubinski left a message on Veliz's voicemail indicating that he had been transferred to the fifth precinct night watch. (Veliz Dep. Tr. at 35-36.)[4]  Veliz called Lubinski and told her that such an assignment would make it impossible for him to continue working on several Hispanic-community outreach projects that then-Chief McManus had asked Veliz to undertake.  (Id. at 36.) Lubinski told Veliz to speak to McManus about the issue, and he did so.  (Id. at 35-39; McManus Dep. Tr. at 24.)  A short time later, he was transferred to the newly created Federal Mediation Compliance unit.  (Id. at 12-13; Veliz Dep. Tr. at 35, 39.)  In that unit, he assisted in ensuring the MPD's compliance with the mandates contained in the Memorandum of Agreement.  (Id. at 46; Arradondo Aff. ¶¶ 6-8.)  While working there, he continued to bring complaints from the Hispanic community to the attention of MPD

---

[3] The Memorandum of Agreement was the product of a Department-of-Justice mediation between the MPD and leaders of the City's various communities of color due to ongoing problems between those communities and the MPD, such as language barriers and the use of excessive force on minorities.  (Veliz Dep. Tr. at 52; McManus Dep. Tr. at 14-15; Klassen Aff. Ex. 9.)  The Memorandum of Agreement contained several action items that the MPD voluntarily undertook to improve relations with the City's minority communities, including establishing a police-community relations council, diversifying the MPD officer ranks at all levels, and offering foreign-language instruction to all police officers.  (Klassen Aff. Ex. 9.)

[4] At all relevant times, the command structure of the MPD was as follows: three Deputy Chiefs of Police overseeing patrol, investigations, and professional services, respectively; an Assistant Chief of Police, to whom each Deputy Chief reported and who was responsible for the day-to-day operations of the MPD; and the Chief of Police.  (Lubinski Dep. Tr. at 8-10; McManus Dep. Tr. at 8-9; Dolan Dep. Tr. at 64.)

administration.  (Veliz Dep. Tr. at 47-49.)  According to Veliz, on at least one occasion Lieutenant Doyle, his supervisor, yelled at him, told him to stop trying to focus on building relationships with the Hispanic community, and ordered him to stop reporting complaints to MPD administration.  (Id. at 47-51.)

On October 14, 2005, Veliz filed two charges of discrimination with the Minneapolis Department of Civil Rights.  (Id. at 61; Klassen Aff. Exs. 11-12.)  In the first, Veliz asserted that the MPD was violating the terms of the Memorandum of Agreement, as well as federal law and a Minneapolis City ordinance, by discriminating against potential employees on the basis of their race and gender.  (Id. Ex. 11.)  In the second, Veliz asserted that *he* had been discriminated against by the MPD on the basis of his race and national origin.  (Id. Ex. 12.)  On October 16, 2005, Veliz held a press conference regarding the charges, and on October 18, 2005, Veliz e-mailed Lubinski, Harris, and then-Assistant Chief Dolan, among others, and stated "[i]n [light] of recent events at my work unit, I am taking vacation until [S]aturday October 22, 2005." (Klassen Aff. Ex. 13; Veliz Aff. ¶ 13.)  In the ensuing weeks, Veliz's charges of discrimination were widely disseminated in the media, including in the Minneapolis *Star Tribune* and on WCCO and KARE-11 television.  (Id. Exs. 14-20.)

On December 4, 2005, the MPD posted a job announcement for a sergeant with the Minnesota Gang Strike Force (the "Strike Force").  (Id. Ex. 24.)  The Strike Force is an "elite," multi-agency anti-gang unit composed of officers from the MPD; the Metropolitan Transit Police; the Sheriff's Offices of Hennepin, Ramsey, Dakota, and

Washington Counties; and the St. Paul, West St. Paul, Brooklyn Park, and Golden Valley Police Departments.  (Lubinski Dep. Tr. at 33-35; Dolan Dep. Tr. at 26-28; Lubinski Aff. ¶ 6.)  Transfer to the Strike Force was a career-enhancing move in terms of training, experience, and the ability to make contacts with other police agencies (McManus Dep. Tr. at 42-43; Dolan Dep. Tr. at 28-31), although it was not an automatic path to promotion (id. at 28-29).  The position also offered the opportunity for overtime beyond that available to Veliz in the Mediation Compliance unit.  (Veliz Aff. ¶ 15.)  The job announcement listed the requirements for the position as follows:

- Must perform all essential functions of a police officer.

- Must be well-organized, self-motivated, and able to work independently (without close supervision).

- Must have strong investigative and analytical skills, along with strong oral and written communication skills.

- Must be willing to communicate effectively with the MPD and other agencies.

- Must have demonstrated leadership and supervisory skills.

(Klassen Aff. Ex. 24.)

Veliz and several other MPD sergeants applied for the position.  Three MPD officers – Lubinski, then-Captain Michael Martin, and Lieutenant Andy Smith (who was the commander of the Strike Force) – were tasked with deciding which applicant would be recommended for the position to the Strike Force's oversight committee.  (Lubinski Dep. Tr. at 35-39; Smith Dep. Tr. at 14-15; Martin Dep. Tr. at 8, 27-28.)  Although they

believed that Veliz was qualified for the position (Klassen Aff. Ex. 32 at 3), they

ultimately selected Sergeant Jeff Jindra, who is Caucasian and American-born and who

had been a sergeant for approximately nine months prior to being transferred to the Strike

Force.  (Jindra Dep. Tr. at 9-11; Klassen Aff. Ex. 30 at 3.)

Believing that he was denied the position with the Strike Force in retaliation for his

complaints and because of his race and national origin, Veliz filed another charge with

the Minneapolis Department of Civil Rights on January 6, 2006.  (Klassen Aff. Ex. 28.)

On February 13, 2007, the Department of Civil Rights found that there was probable

cause to believe that the MPD had discriminated against Veliz on the basis of his race and

national origin and that it had retaliated against him due to his complaints.  (Id. Ex. 29.)

Veliz then voluntarily withdrew his charge in order to commence the instant action.  In

his Complaint, Veliz alleges race discrimination, national-origin discrimination, and

retaliation in the denial of his application to join the Strike Force, in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981

("Section 1981"); the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. §

363A.01 et seq.; and the Minneapolis Civil Rights Ordinance (the "MCRO"),

Minneapolis Code Ord. § 139.01 et seq.  The City now moves for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Mems v. City of St. Paul, Dep't of

Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the

evidence, and the inferences that may be reasonably drawn from it, in the light most

favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721,

723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir.

1997).  The nonmoving party may not rest on mere allegations or denials, but must show

through the presentation of admissible evidence that specific facts exist creating a genuine

issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v.

County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

**I.     The legal framework**

Claims under Title VII are analyzed using the tripartite burden-shifting framework

set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Recio v.

Creighton Univ., 521 F.3d 934, 938 (8th Cir. 2008).[5]  The same standard applies to claims

under Section 1981, the MHRA, and the MCRO   See, e.g., King v. Hardesty, 517 F.3d

1049, 1057 (8th Cir. 2008) (applying McDonnell Douglas to Section 1981 claim);

Sigurdson v. Isanti County, 386 N.W.2d 715, 719-20 (Minn. 1986) (MHRA claim);

---

[5] A different analysis applies when a plaintiff proffers "direct evidence" of discrimination.  See, e.g., Gross v. FBL Fin. Servs., Inc., 526 F.3d 356, 359-60 (8th Cir. 2008). Veliz concedes that he has proffered no such evidence and that his claims should be evaluated under McDonnell Douglas.  (See Mem. in Opp'n at 27.)

Huggins v. Pechiney Plastics Packaging, Inc., No. A05-255, 2005 WL 3527248, at *2

(Minn. Ct. App. Dec. 27, 2005) (MCRO claim).[6]  In order to survive summary judgment

under the McDonnell Douglas framework, a plaintiff must first establish a *prima facie*

case, the elements of which differ slightly for discrimination claims and retaliation

claims.  In order to establish a *prima facie* case of discrimination, a plaintiff must show

that (1) he belongs to a protected class, (2) he was qualified for the position he sought,

(3) he suffered an adverse employment action, and (4) the adverse action occurred under

circumstances giving rise to an inference of discrimination.  E.g., Elnashar v. Speedway

SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).  In order to establish a *prima*

*facie* case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected

activity, (2) he suffered an adverse employment action, and (3) there exists a causal

connection between the two.  E.g., King, 517 F.3d at 1064.  A plaintiff's burden at the

*prima facie*-case stage is "not onerous."  Tex. Dep't of Cmty. Affairs v. Burdine, 450

U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory (or nonretaliatory) reason for the challenged

employment action.  E.g., Culton v. Mo. Dep't of Corr., 515 F.3d 828, 830 (8th Cir.

2008); Elnashar, 484 F.3d at 1055.  If the defendant does so, then the plaintiff must come

---

[6] Section 1981, which on its face gives all persons the equal right to "make and enforce contracts," provides a cause of action "for discrimination in the employment relationship," King, 517 F.3d at 1056 n.4 (citation omitted), including retaliation, see CBOCS W., Inc. v. Humphries, __ U.S. __, 128 S. Ct. 1951, 1961 (2008).

forward with sufficient evidence to create a genuine issue that the proffered reason is pretextual.  Culton, 515 F.3d at 830; Elnashar, 484 F.3d at 1055.

The City spends nearly nine pages of its brief arguing that Veliz has failed to establish *prima facie* cases of discrimination and retaliation.  (See Def. Mem. at 13-17, 25-28.)  Veliz responds in kind.  (See Mem. in Opp'n at 27-34, 39-40.)  Yet, there is no reason for the Court to get bogged down in these arguments.  As the Eighth Circuit recently stated when analyzing a discrimination claim:

> The parties have spent a great deal of time in briefing and at oral argument disagreeing about whether [the plaintiff] established a prima facie case under the McDonnell Douglas burden-shifting framework, especially whether it is [the plaintiff's] burden at the second step to prove that he was merely "qualified for the job" or whether he met the more (seemingly) onerous burden of proving that he "met [the defendant's] legitimate expectations." . . . However, even assuming that there is a distinction with a difference between the two articulations, and the "qualified for the job"-articulation at the second step is indeed a less onerous standard, . . . we need not devote extensive analysis to the subject here.  Rather, we must see the forest through the trees.
>       "The prima facie case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic," and "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, *whether the plaintiff really did so is no longer relevant*."  United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (internal quotation omitted).  Thus, we need not indulge the parties' disputes about . . . whether [the plaintiff] met his burden in establishing a prima facie case under McDonnell Douglas regardless of the "threshold" we have set for such proof.

Riser v. Target Corp., 458 F.3d 817, 820-21 (8th Cir. 2006) (emphasis added) (internal citations omitted).

Here, the City has done everything that would be required of it had Veliz established *prima facie* cases of discrimination and retaliation:  it has articulated its

alleged reason for selecting Jindra for the Strike Force position (Jindra was the better-qualified candidate) and it has fully developed the record on that issue.  Accordingly, the Court need not decide whether Veliz has stated his *prima facie* cases.  Instead, it will jump directly to the "ultimate question of discrimination [and retaliation] *vel non*." Hervey v. County of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008); accord Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005).[7]

---

[7] Nevertheless, it appears that Veliz has stated *prima facie* cases of discrimination and retaliation.  As to the former, the City concedes the first two prongs of the *prima facie* case – protected class and qualified for the position – have been met.  (Def. Mem. at 13.)  It argues, however, that Veliz did not suffer an adverse employment action because the Strike Force position was merely a "lateral transfer" with the same rate of pay and without promotional guarantees.  (Id. at 14.)  An employer's action is "adverse" if it has a material impact on the terms and conditions of employment.  Saulsberry v. St. Mary's Univ. of Minn., 318 F.3d 862, 868 (8th Cir. 2003).  The City conceded in its brief and at oral argument that the Strike Force position included a greater opportunity for overtime, which was sufficient to render the denial of Veliz's application for that position an adverse employment action.  See, e.g., Black v. Indep. Sch. Dist. No. 316, 476 F. Supp. 2d 1115, 1124 (D. Minn. 2007) (Kyle, J.); Tatroe v. Cobb County, Ga., No. 1:04-CV-1074, 2006 WL 559437, at *8 (N.D. Ga. Mar. 7, 2006) ("Denials of the opportunity to work overtime generally are deemed adverse employment actions, since they directly affect an employee's compensation.").  The City also asserts that Veliz fails at the fourth prong of the *prima facie* case because the denial of his application did not occur under circumstances giving rise to an inference of discrimination.  (Def. Mem. at 16-17.)  Yet, there is no dispute that Jindra, a Caucasian and American-born sergeant with arguably lesser qualifications (as discussed below), obtained the Strike Force position.  Accordingly, the fourth prong of the *prima facie* case has been met.  See, e.g., Turner v. Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003).

As for the retaliation claim, the City again argues that Veliz did not suffer an adverse employment action.  (Def. Mem. at 25-27.)  An adverse employment action for a retaliation claim differs from that in a discrimination claim – it is an action that "would have dissuaded a reasonable worker from making . . . a claim of discrimination."  Hervey, 527 F.3d at 722.  In the Court's view, denial of a transfer to an elite position, and the concomitant loss of overtime opportunities, would dissuade a reasonable worker from complaining of discrimination.  The City also argues that Veliz cannot show a causal connection between his discrimination complaints and the denial of the transfer.  (Def. Mem. at 27-28.)  In the Court's view, however, the proximity of these two events, when combined with the other evidence discussed below, is sufficient for a reasonable jury to find a causal connection between Veliz's complaints and the

**II.     The "ultimate issue" of discrimination *vel non***

Having carefully reviewed the record, the Court determines that summary judgment must be denied because Veliz has proffered sufficient evidence from which a reasonable jury could conclude that he was denied the Strike Force position for discriminatory and/or retaliatory reasons.

**A.     Better qualifications**

The City's position is that Jindra was a "better" candidate for the Strike Force position.  (See Mem. in Opp'n at 17-20; Klassen Aff. Ex. 30.)  Where an employer claims "that the selected candidate was more qualified . . . than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision."  Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 857 (8th Cir. 2003).  The use of subjective criteria such as being a "better candidate" or being "more qualified" is not impermissible, see Blake v. J.C. Penney Co., 894 F.2d 274, 281 (8th Cir. 1990), but the Eighth Circuit has cautioned that subjective reasons must be carefully scrutinized, since they "are particularly easy for an employer to invent in an effort to . . . mask discrimination."  McCullough v. Real Foods, Inc., 140 F.3d 1123, 1129 (8th Cir. 1998); accord Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 646 n.2 (4th Cir. 2002) ("we . . . recognize the reality that an employer asked to justify its actions after the fact has an incentive to claim that the

---

denial of his application for the Strike Force position.  See Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 915 (8th Cir. 2006).

'real' criteria were those on which the chosen employee happens to perform best relative to the plaintiff").

Here, when the record is viewed in the light most favorable to Veliz, the contention that Jindra was better qualified becomes suspect.  Of particular note is the City's written response to Veliz's charge of discrimination/retaliation.  There, the City claimed that Veliz had limited supervisory skills while Jindra "had significant experience in CRT and in a supervisory capacity." (Klassen Aff. Ex. 30 at 3-4.)  Yet, Jindra had been a sergeant for only nine months prior to his transfer to the Strike Force, while Veliz had served for more than four years as a sergeant on the fifth precinct CRT.  (Klassen Aff. Exs. 1, 27.)  The response stated that Lubinski had spoken with Ellenberg (the commander of the fifth-precinct CRT) concerning Veliz's time with that unit and that Ellenberg purportedly had told Lubinski that, except for approximately two months, Veliz had worked only "on a grant position for outreach to the Latino community."  (Id.)  That assertion, however, is contradicted by Ellenberg's Affidavit, in which he states that although Veliz did perform some grant work during his time with the CRT, "the majority of his job duties" involved anti-gang and anti-narcotics investigations and policing. (Ellenberg Aff. ¶ 12.)  The City's response to Veliz's charge of discrimination/retaliation also placed emphasis on Jindra's service on the MPD's SWAT team (id.), but both Martin and Smith, two of the decision-makers, testified that SWAT experience was unnecessary for the Strike Force.  (Martin Dep. Tr. at 21-22; Smith Dep. Tr. at 19.)

Beyond the written response to the discrimination/retaliation charge, other

evidence exists to cast doubt upon the City's assertion that Jindra was better qualified for

the Strike Force position.  For instance, Martin and Smith each testified that Spanish

fluency would be an important skill for Strike Force members (Martin Dep. Tr. at 30;

Smith Dep. Tr. at 21), yet Veliz is fluent in Spanish and Jindra is not (Veliz Aff. ¶ 2;

Jindra Dep. Tr. at 12).  Martin also testified that community outreach is a crucial function

for a sergeant on the Strike Force, particularly within the Hispanic community given the

proliferation of gang activity therein.  (Martin Dep. Tr. at 33-34.)  There is no dispute that

Veliz has significant contacts within the Hispanic community and experience with

outreach to that community that Jindra simply does not have.  Finally, Lubinski testified

in her deposition that one factor in the selection process was whether a candidate had any

sustained complaints against him.  (Lubinski Dep. Tr. at 40.)  Jindra has one sustained

excessive-force complaint on his record; Veliz has none.  (Jindra Dep. Tr. at 22-23; Veliz

Aff. ¶ 14.)

Certainly, there are some noteworthy differences between Jindra's experience and

Veliz's experience.  For example, while both had prior CRT experience, Jindra worked on

the fourth precinct's CRT, an area with significantly higher crime rates and gang and

narcotics activity than the fifth precinct, where Veliz worked on the CRT.  (Lubinski Dep.

Tr. at 66-67.)  In addition, Jindra previously worked as a detective for the City of

Brooklyn Park, and in that capacity he was the lead investigator on several high-profile

matters, including a homicide and a number of federal prosecutions.  (Lubinski Dep. Tr.

at 68; Klassen Aff. Ex. 26.)  When viewed in the light most favorable to Veliz, however,

the facts set forth above raise a genuine issue whether Jindra truly was more qualified for the Strike Force position – in other words, whether the City's proffered reason is a pretext for discrimination or retaliation.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [proffered] explanation that the employer is dissembling to cover up a discriminatory purpose").[8]

## B.    Shifting explanations

The City argues that one reason Veliz did not obtain the position is that he is not a "motivated sergeant" who impressed his superiors with his work ethic.  (Def. Mem. at 17-20; see also Lubinski Aff. ¶¶ 21-23.)  It points to McManus's deposition testimony that Veliz "wasn't very dependable" and "often would beg out of meetings" because his mind was not focused on his job.  (Def. Mem. at 18-19 (citing McManus Dep. Tr. at 54-60).)  Nowhere in its response to Veliz's charge of discrimination/retaliation, however, did the City mention Veliz's purported lack of motivation.  (See Klassen Aff. Ex. 30.)  Nor was that alleged deficiency mentioned in the City's Answers to Veliz's Interrogatories, in which the City was asked to explain why it believed Veliz was not the most qualified applicant.  (See Klassen Aff. Ex. 32 at 1-2.)[9]  The City also admitted in its Interrogatory

---

[8] The Court does not mean to suggest that Jindra was unqualified for the Strike Force position; indeed, Veliz concedes that he was.  (See Mem. in Opp'n at 35-37.)  The issue, rather, is whether a reasonable jury could conclude that Jindra was not *more* qualified, as the City suggests.

[9] Notably, Veliz intimated in his application for the Strike Force position that he had considered the increased commitment that the position would entail, and he expressed his

Answers that it "does not contend [Veliz's] job performance was not satisfactory." (Id. at 1.)  Simply put, the City appears to be changing its tune, and an employer's "[s]ubstantial changes over time in [its] proffered reason for its employment decision support a finding" of discrimination or retaliation.  Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994).

Likewise, the City argues that the retaliation claim must fail because nothing in the record suggests that Lubinski, Martin, and Smith were aware of Veliz's discrimination complaints at the time they rejected his application.  (Def. Mem. at 27-28.)  Indeed, in their depositions, Lubinski and Smith denied having knowledge of those complaints, and Martin could not recall whether he was aware of them.  (See Lubinski Dep. Tr. at 50; Martin Dep. Tr. at 13-15; Smith Dep. Tr. at 25-26.)  Yet, the City never mentioned this purported lack of knowledge in its response to Veliz's charge of discrimination/retaliation (see Klassen Aff. Ex. 30), an omission expressly noted by the Department of Civil Rights in its probable-cause determination (see id. Ex. 29 at 15).  One would reasonably expect the City to raise such an argument in its response, as the lack of knowledge by the decision-makers would have provided a complete defense to the retaliation charge.  See, e.g., Hervey, 527 F.3d at 722 ("An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation.").  The City's failure to assert this "fact" in its response is telling.

---

willingness to undertake that commitment.  (See Klassen Aff. Ex. 25.)

Moreover, there exists a plethora of evidence in the record, both direct and circumstantial, from which a reasonable jury could conclude that the decision-makers were indeed aware of Veliz's charges.  There is no dispute that the charges were covered extensively in the media, including in the Minneapolis *Star Tribune*, a newspaper that Martin and Smith admitted they read when it contains articles pertaining to the MPD. (Martin Dep. Tr. at 6-7; Smith Dep. Tr. at 25-26.)  McManus testified in his deposition that the "command structure" at the MPD – which included Lubinski – was aware of Veliz's discrimination charges due to their extensive media coverage, and that it was "not believable" for almost any officer, and in particular high-ranking officers, to deny knowledge of the charges.  (McManus Dep. Tr. at 27-33.)  Similarly, Dolan testified that high-level officers "probably knew" about the charges (Dolan Dep. Tr. at 57), and former Deputy Chief Harris testified that he became aware of Veliz's discrimination charges "immediately" after they were filed and that "[a]ll deputy chiefs, especially one like Lubinski who was in charge of patrol and/or who had participated in the drafting and negotiations [of the Memorandum of Agreement], would have been in a position to know about" the charges (Harris Aff. ¶¶ 7, 10).[10]  Finally, Veliz points to his October 18, 2005 e-mail to Lubinski (among others), sent a mere two days after the press conference

---

[10] In its Reply, the City argues that the Court should disregard Harris's Declaration because it was unsworn.  (Reply Mem. at 1.)  That argument overlooks 28 U.S.C. § 1746, pursuant to which declarations made under penalty of perjury (like Harris's) are given the same force and effect as sworn affidavits.  E.g., Burgess v. Moore, 39 F.3d 216, 217-18 (8th Cir. 1994) ("documents signed and dated under penalty of perjury are treated as verified and satisfy affidavit requirements in federal proceedings").

concerning his discrimination charges, in which he stated "*[i]n [light] of recent events at my work unit*, I am taking vacation until [S]aturday October 22, 2005." (Klassen Aff. Ex. 13 (emphasis added).) Based on this evidence, a reasonable jury could conclude that Lubinski, Martin, and/or Smith were aware of Veliz's charges and that their denials of such knowledge were designed *ex post facto* to mask their retaliatory intent.

### C.    Additional evidence

Finally, there is other evidence in the record to support Veliz's claims. For instance, it appears that no minority MPD sergeants have ever been appointed as sergeants on the Strike Force. Neither Lubinski nor Smith could recall any sergeants of color having worked on the Strike Force (Lubinski Dep. Tr. at 49-50; Smith Dep. Tr. at 18), and the Department of Civil Rights' probable-cause determination notes that, in addition to Jindra, three other MPD sergeants were transferred to the task force between 1999 and 2006 – all Caucasian males. (Klassen Aff. Ex. 29 at 5.) In addition, two MPD Lieutenants, Medaria Arradondo and Lee Edwards, have stated that they have witnessed acts of discrimination by MPD administration and that there exists a "culture of discrimination and retaliation" within the MPD against officers of color who complain. (Arradondo Aff. ¶¶ 3-4; Edwards Aff. ¶¶ 3-4.)

## CONCLUSION

The Court is cognizant that it must not "sit as a 'super-personnel department' to second guess the wisdom of . . . personnel decisions." Ward v. Int'l Paper Co., 509 F.3d 457, 462 (8th Cir. 2007) (citation omitted). Nevertheless, for the reasons set forth above,

the Court concludes that Veliz has proffered sufficient evidence to create a genuine issue as to whether he was discriminated against and retaliated against as a result of his complaints.  Accordingly, Defendants' Motion must be denied.

In denying the Motion, however, the Court in no way expresses an opinion on Veliz's likelihood of success at trial or his ability to survive a motion for judgment as a matter of law after the presentation of his case.[11]  Indeed, the Court notes that it is somewhat inconsistent for Veliz to allege, on one hand, that he did not obtain the Strike Force position because of his race (or national origin), and for him to allege on the other hand that he did not obtain the position in retaliation for his discrimination complaints. As Justice Thomas noted in his dissent in CBOCS West, Inc. v. Humphries, __ U.S. __, 128 S. Ct. 1951, 1963 (2008), "[w]hen an individual is subjected to reprisal because he has complained about racial discrimination, the injury he suffers is not on account of his *race*; rather, it is the result of his *conduct*." (emphases in original).[12]  While in no way suggesting how Veliz should proceed at trial, the Court notes that the crux of this case appears to be retaliation, and Veliz seems to agree – of the seventeen pages of legal argument in his brief, only about two pages are devoted to the discrimination claims (which contain scant mention of the national-origin claims at all), and no mention of the

---

[11] Nor does the Court express an opinion at this juncture on the admissibility of any evidence Veliz and/or the City intend to introduce at trial.

[12] This is not to say that Veliz cannot rely on the same evidence to support his claims of discrimination and retaliation.  Case law makes clear that such claims may be proved with the same evidence, such as evidence casting doubt on the employer's proffered reason for its actions, indicating that the employer has offered shifting explanations, etc.

20

discrimination claims was made at oral argument.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 19) is **DENIED**.


Dated: July 2, 2008                                    s/Richard H. Kyle
                                                       RICHARD H. KYLE
                                                       United States District Judge